UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THOMAS STALCUP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| NAVAL SPECIAL WARFARE COMMAND, | ) |
| | ) |
| Defendant. | ) |
| | ) |

CIVIL ACTION
NO. 13-11966-WGY

FINDINGS OF FACT AND RULINGS OF LAW

YOUNG, D.J.                                              August 27, 2015

I.   **INTRODUCTION**

The plaintiff Thomas Stalcup ("Stalcup") has filed the
instant action against the Naval Special Warfare Command
("NSWC") challenging the adequacy of its search in response to
his request for records under the Freedom of Information Act
("FOIA"), 5 U.S.C. § 552.

Stalcup filed his initial complaint against NSWC on August
15, 2013.  Compl., ECF No. 1.  Following several delays, NSWC
moved for summary judgment in its favor on January 22, 2015,
filing a memorandum in support of its motion that same day.
Def.'s Mot. Summ. J., ECF No. 21; Mem. Supp. Def.'s Mot. Summ.
J. ("Def.'s Mem."), ECF No. 22.  On February 11, 2015, Stalcup
filed his own motion for summary judgment and an overlength
memorandum in support of his motion and in opposition to the

motion filed by NSWC.  Pl.'s Mot. Summ. J., ECF No. 24; Pl.'s

Mem. Opp'n Defs.' Mot. Summ. J. & Supp. Pl.'s Mot. Summ. J., ECF

No. 25.  NSWC filed a reply memorandum in support of its motion

on February 24, 2015.  Def.'s Reply Br. Supp. Mot. Summ. J.

("Def.'s Reply"), ECF No. 32.  After the Court denied his ex

post facto motion for leave to file excess pages, Elec. Order,

ECF No. 34, Stalcup filed an amended motion for summary judgment

and an amended memorandum on March 12, 2015, Pl.'s Am. Mot.

Summ. J., ECF No. 37; Pl.'s Am. Mem. Opp'n Def.'s Mot. Summ. J.

& Supp. Pl.'s Am. Mot. Summ. J. ("Pl.'s Mem."), ECF No. 38.  The

parties agreed to have their cross-motions for summary judgment

resolved at a case stated hearing[1] held on May 1, 2015.  Elec.

Clerk's Notes, ECF No. 41.  The Court here makes the following

findings of fact and rulings of law as required by Fed. R. Civ.

P. 52.

## II.  FINDINGS OF FACT

On July 17, 1996, Trans World Airlines ("TWA") Flight 800

crashed into the ocean off Moriches Inlet on the South Shore of

Long Island, killing all 236 passengers aboard.  See Def.'s Mem.

---

[1] A case stated hearing is a procedure that allows the Court
to make a judgment based on the record in cases where there are
minimal factual disputes.  In its review of the record, the
Court is entitled to "engage in a certain amount of factfinding,
including the drawing of inferences."  TLT Constr. Corp. v. RI,
Inc., 484 F.3d 130, 135 n.6 (1st Cir. 2007) (quoting United
Paperworkers Int'l Union Local 14 v. Int'l Paper Co., 64 F.3d
28, 31 (1st Cir. 1995)) (internal quotation marks omitted).

1; Def.'s Mem., Ex. 1, Decl. Lt. Griffin Farris ("Farris Decl.") ¶ 4, ECF No. 22-1.  Two government agencies – the Federal Bureau of Investigation ("FBI") and the National Transportation Safety Board ("NTSB") – began investigating the crash, focusing on the possibilities that the crash had been caused by a bomb, a missile, or some sort of mechanical failure.[2]  Farris Decl. ¶ 4. As part of the investigation, the Navy spent roughly three months recovering wreckage and the bodies of passengers.  Id.

Stalcup, who disbelieves the government's ultimate conclusion that a mechanical failure caused the crash of TWA Flight 800, submitted a FOIA request to the U.S. Special Operations Command on March 30, 2010, asking for all information "regarding any and all Navy Seal activity within 100 miles of the coast of Long Island, NY during the months of July and August 1996 . . . from records of the elite Seal team, the Naval Special Warfare Development Group, as well as all other Seal teams, groups, and units."  Def.'s Reply, Ex. A, FOIA Request Letter 1, ECF No. 32-1.  Stalcup additionally identified a variety of specific kinds of information he was requesting, such as lists of Seal teams involved in recovery activities and detailed descriptions of their activities.  See id.  The U.S.

---

[2] This tragedy has spawned a great deal of conspiracy literature.  One of the more entertaining fictional entries is Nelson DeMille, Night Fall (2004).

Special Operations Command forwarded Stalcup's FOIA request to NSWC, which is the division of the Navy responsible for the teams involved in the TWA recovery efforts.  See Farris Decl. ¶ 6.

After an initial search turned up no responsive records, Lieutenant Griffin Farris ("Lt. Farris") – the JAG officer tasked with coordinating the response to Stalcup's FOIA request – organized a broadened search.  Id. ¶¶ 1, 7-10.  The Navy's recordkeeping system is decentralized such that each command keeps its own records; accordingly, numerous commands that were listed as involved in the TWA recovery on a website cited by Stalcup carried out individual searches regarding their activities during the time period covered by the FOIA request. See id. ¶¶ 10-12.  Additionally, the Naval History and Heritage Command ("NHHC") searched the command histories[3] covering the full calendar year 1996 for each of the units in question, specifically looking for lines indicating that the commands

---

[3] A so-called command history "serve[s] as the 'only overall record of a command's operations and achievement that is permanently retained' . . . [and is] the means by which individual Navy units record their primary activities in a particular year and include information such as mission, chronology of events, significant training exercises, and operations."  Def.'s Reply, Ex. B, Supp. Decl. Lt. Griffin Farris ¶ 5, ECF No. 32-2.  Put succinctly, a command history is a summary of what a unit did during a given year.

participated in any activities relevant to the plane crash. Def.'s Reply 2-3; Farris Decl. ¶ 12(t).

After each command searched its own records, the Navy produced the results of the search to Stalcup in two batches. The first, produced on December 11, 2013, consisted of twelve documents comprising 440 pages with minimal redactions to remove personal identifying information.  Farris Decl. ¶ 14.  The second, produced March 24, 2014, came from the parent command of the dive unit involved in the recovery effort and consisted of one video DVD and more than 550 pages of records.  Id. ¶¶ 12(v), 15.  The command history of one unit was originally withheld as classified, but upon an examination by Navy personnel, the responsive portions of the history were declassified and produced.  Id. ¶¶ 16-18.  After this litigation commenced, Lt. Farris conducted another search of the NHHC to determine whether there were any command histories not included in the original search that were responsive to Stalcup's request.  Def.'s Reply, Ex. B, Supplemental Decl. Lt. Griffin Farris ("Supplemental Farris Decl.") ¶ 6, ECF No. 32-2.  The search turned up no additional information not already reflected in the records turned over to Stalcup in earlier productions.  See id. ¶ 7.

## III. RULINGS OF LAW

### A.   Legal Standard

The crux of this case is the dispute over whether the Navy's search for records responsive to Stalcup's request was reasonable.  Courts facing this question must ask "not whether relevant documents might exist, but whether the agency's search was 'reasonably calculated to discover the requested documents.'"  <u>Maynard</u> v. <u>CIA</u>, 986 F.2d 547, 559 (1st Cir. 1993) (quoting <u>Safecard Servs., Inc.</u> v. <u>SEC</u>, 926 F.2d 1197, 1201 (D.C. Cir. 1991)).  An agency may establish the adequacy of its search through "affidavits provided they are relatively detailed and nonconclusory, and are submitted by responsible agency officials in good faith."  <u>Id.</u>  The affidavit must "describe in reasonable detail the scope and method by which the search was conducted . . . [and] 'describe at least generally the structure of the agency's file system which makes further search difficult.'" <u>Id.</u> at 559 (quoting <u>Church of Scientology of Cal.</u> v. <u>IRS</u>, 792 F.2d 146, 151 (D.C. Cir. 1986)).  If the government's proffered affidavit meets this standard, "a rebuttable presumption that the agency acted in good faith emerges."  <u>Stalcup</u> v. <u>CIA</u>, 768 F.3d 65, 74 (1st Cir. 2014) (citing <u>Maynard</u>, 986 F.2d at 560). Rebutting this presumption of good faith requires more than "purely speculative claims about the existence and discoverability of other documents."  <u>Maynard</u>, 986 F.2d at 560

[6]

(quoting Safecard Servs., 926 F.2d at 1200) (internal quotation marks omitted).  Rather, a plaintiff must offer sufficient evidence to "raise[] substantial doubt, particularly in view of well defined requests and positive indications of overlooked materials."  Oleskey ex rel. Boumediene v. U.S. Dep't of Defense, 658 F. Supp. 2d 288, 295 (D. Mass. 2009) (Stearns, J.) (quoting Iturralde v. Comptroller of Currency, 315 F.3d 311, 313-14 (D.C. Cir. 2003)) (internal quotation marks omitted).

### B.   Adequacy of NSWC's Search

NSWC seeks to justify the scope and adequacy of its search in response to Stalcup's FOIA request through two affidavits provided by Lt. Farris.  See Def.'s Mem.; Def.'s Reply.  While his briefing is not entirely clear, Stalcup appears to focus on two particular ways in which the Farris affidavit is insufficient to support the search: first, its purportedly conclusory nature and failure to describe the file systems involved, and second, NSWC's failure to carry out the search using terms responsive to his request for information about Seal team activities before the crash of TWA Flight 800.  See Pl.'s Mem. 7, 14.

Turning to this first point, Stalcup repeatedly alleges that the Farris affidavit fails to either identify what files were searched or describe the nature of the systems in which files are stored.  E.g., id. at 7-10.  Specifically, he claims

that only two small parts of the affidavit – paragraphs 7 and 12(s) – actually describe NSWC's search of its commands.  Id. at 10.  Moreover, at the case stated hearing Stalcup claimed that the extent of the Farris affidavit's description of the kinds of files involved - describing them as "paper and electronic" - offers no specific information whatsoever.  Given this dearth of information, he says, NSWC has not shown that its search was adequate as required by the First Circuit's case law.

Stalcup, however, misrepresents much of Lt. Farris's affidavit.  He is right that only paragraphs 7 and 12(s) deal with searches carried out within the narrow confines of NSWC, but the affidavit also points out that the Navy's recordkeeping is decentralized and that each command maintains its own records.  Farris Decl. ¶ 11.  It goes on to explain how NHHC searched through all possibly relevant command histories to identify the individual commands that might have records responsive to Stalcup's request, and it then spends nine pages describing the search parameters used by each of the commands and the results that these searches yielded.  See id. ¶ 11–12. Viewed collectively, this meets Maynard's requirement that the affidavit describe "the scope and method by which the search was conducted . . . [and] at least generally the structure of the agency's file system." Maynard, 986 F.2d at 559 (internal quotation marks omitted).  Specifically, the description of the

decentralized structure of recordkeeping strikes the Court as meeting the latter prong of <u>Maynard</u>'s test, while the description of the search of command histories and the individual descriptions of each command's separate search meets the former.  While Stalcup might wish for more detail, the Court is satisfied that the search has been described with sufficient adequacy to give rise to the presumption that the affidavit was filed in good faith.

In addition to discussing the specificity of the affidavit's descriptions, Stalcup also attacks the adequacy of Lt. Farris's affidavit by arguing that the search terms described in the affidavit were only designed to turn up information pertaining to the time period after the plane crash, despite the fact that his original request also covered a period of time before the crash.  <u>See</u> Pl.'s Mem. 12, 14.  According to Lt. Farris, each of the commands that carried out individual searches of their records used search terms along the lines of "1996", "17 July 1996", "TWA", "TWA Flight 800", "recovery", and "submerged debris."  <u>See</u> Farris Decl. ¶¶ 12(d)-(l), 12(o), 12(q), 12(s).  Stalcup notes that "[a]ny [search responsive to the request for pre-crash materials] would not have used those search terms, since underwater recovery operations officially began days after the crash."  Pl.'s Mem. 14.  Similarly, he argues that a "[Seal] mission or operation scheduled for a time

prior to or during the crash . . . would not likely have listed 'TWA 800' or 'recovery' in any correspondence, planning or other responsive document." Id.  Were the search "reasonably calculated to discover responsive documents," as is required by the law, Stalcup says that it would have included terms such as "'1996,' 'July,' 'Atlantic Coast,' 'Long Island,' 'Groton,' 'CT,' 'Connecticut,' 'New York,' [and] 'New Jersey[.]'" Id.

NSWC makes several arguments in response.  First, it notes that Stalcup never proposed any of these search terms in his original FOIA request and that many of his proposed terms are too general or not facially related to the scope of his request. Def.'s Reply 2.  Second, NSWC observes that the Navy personnel manually examined – that is to say, examined without using search terms – the 1996 command histories for every unit reasonably likely to have responsive records.  Id. at 2-3. Because these command histories span the entire calendar year of 1996, this portion of the search was indeed designed to address the portion of the FOIA request Stalcup says was ignored – and indeed, "any information responsive to [his] request, including those portions pertaining to the time period before the TWA 800 crash, was therefore identified through these reviews and produced." Id. at 3.

The Court finds NSWC's latter point persuasive.  While Stalcup is correct that many of the search terms used by

individual commands are relevant only to the period following
the crash, he is wrong to leap to the conclusion that this means
that NSWC did not search for and produce information related to
their activities in the time leading up to the crash.  The
manual search of the command histories for the entire year of
1996 encompasses the relevant time period in its entirety; were
any individual command to have been in the Long Island Sound
area or the Atlantic Ocean off its South Shore at this
particular time, that fact logically would have been reflected
in the portions of the command histories produced to Stalcup.
It would be unreasonable for the Court to deem the entire search
inadequate based on an individual command's failure to employ
search terms to find information that the manual search of that
command's histories did not uncover.  Accordingly, this line of
argument is rejected, and the Court finds that the affidavit
provided by NSWC is entitled to a presumption of good faith.
See Stalcup, 768 F.3d at 74.

     Now that the Court has found that NSWC is entitled to this
presumption, Stalcup may rebut this presumption only if he
"raises substantial doubt [as to the record], particularly in
view of well defined requests and positive indications of
overlooked materials."  Oleskey, 658 F. Supp. 2d at 295.
Stalcup points to numerous aspects of the record that he says
evince bad faith: the absence of details on NWSC's file systems

from the Farris affidavit, despite Stalcup's request for this information in correspondence following the production of records, Pl.'s Mem. 13; NSWC's failure to use additional search terms suggested by Stalcup, id. at 14; NSWC's failure to list the search terms used when searching a particular command, even after Stalcup had pointed out this oversight, id. at 15; NSWC's ignoring Stalcup's request for an official to attest to the Navy's command and control structure, id. at 15-16; NSWC's ignoring Stalcup's suggestion that it had transferred relevant documents to other agencies to hide them from FOIA exposure, id. at 16-17; the relative dearth of records produced when set against the historic nature of the TWA crash, id. at 17-18; and the dearth of records despite the fact that the Joint Chiefs of Staff have a policy requiring permanent maintenance of the kinds of records involved in this case, id. at 18.

The first two arguments Stalcup raises to suggest bad faith (regarding information on file system structure and use of search terms) can be dismissed out of hand, as the Court has already ruled that the affidavit contains sufficient information on these points to be entitled to the presumption of good faith. The second two (regarding NSWC's failure to list search terms for one particular command or to provide information on the Navy's command structure) fail for similar reasons, as these

complaints are substantially analogous to the first two indicia
of bad faith that the Court has just rejected.

NSWC offers several rebuttals to the argument that it
demonstrated bad faith by secretly transferring records to other
departments, see Def.'s Reply 5-6, but the Court can reject this
argument simply based on the insufficiency of the evidence
offered by Stalcup.  The only thing he proffers to support his
claim is an Associated Press article discussing the moving of
records regarding the Seal team strike that killed Osama bin
Laden.  See Decl. Thomas Stalcup ("Stalcup Decl."), Ex. C,
Secret Move Keeps bin Laden Records in the Shadows, ECF No. 26-
3.  Nothing beyond conjecture suggests that NSWC employed the
same tactics to hide any records about TWA Flight 800, and the
law requires more than mere speculation to rebut the presumption
of good faith.  Maynard, 986 F.2d at 560.  Moreover, were the
Court to allow this article to support a finding of bad faith,
then no affidavit filed regarding Seal team activities could be
considered filed in good faith – after all, if a single instance
of record-shifting casts this affidavit into question, it must
by extension cast all into question.  For these reasons, the
Court declines to find that this argument overcomes the
presumption of good faith.

Similarly, NSWC offers several pages of argument regarding
Stalcup's contention that the disparity between the historic

nature of the plane crash and the paucity of records indicates
bad faith, see Def.'s Reply 6-9 (arguing, inter alia, that more
than 1,000 pages were produced and that the possibility that
more records exist does not mean a search was not reasonable),
but the Court rejects this contention for a simple reason.  At
its core, Stalcup's argument essentially boils down to the idea
that there must be more information out there somewhere – but
this is no more than mere speculation.  In the absence of
"positive indications of overlooked materials," meaning specific
documents that ought exist but do not, see Oleskey, 658 F. Supp.
2d at 295, this argument does not cast sufficient doubt on the
record to overcome the presumption that Lt. Farris's affidavit
was offered in good faith.

   The final argument regarding bad faith – that an
affirmative policy of the Joint Chiefs of Staff requires that
records of the sort contemplated by Stalcup's FOIA request be
retained permanently, see Stalcup Decl., Ex. D, Joint Staff &
Combatant Command Records Mgmt. Manual Vol. II C-79-80, ECF No.
26-4 – also must be rejected.  As a preliminary matter, the
parties dispute whether the agencies at issue in this case are
subject to this requirement at all.  See Pl.'s Mem. 18 (citing
the aforementioned Associated Press article to support the
argument that the policy does apply); Def.'s Reply 9 (arguing
without offering evidence that the policy only applies to

Combatant Commands and that the Navy does not qualify).  Even if
Stalcup is correct that the policy does apply, however, NSWC
rightly points out that his argument "presupposes that the type
of records required to be permanently maintained exist and that
they have not been produced."  Def.'s Reply 9.  Viewed this way,
this argument functionally relies on speculation regarding the
existence of records in broad categories – broad both in the
sense that Stalcup's requests are nonspecific and that the
policy manual in question contemplated a wide variety of types
of records.  While Stalcup is right that certain records must be
maintained, he has not done enough to convince the Court that
the specific records existed in the first place, and thus the
Court will not impute bad faith to the Farris affidavit.

Having ruled that the Farris affidavit is sufficiently
detailed and that Stalcup has failed to overcome the resulting
presumption that the affidavit was offered in good faith, the
Court accordingly rules that NSWC's search in response to
Stalcup's FOIA request was adequate.

C.    In Camera Review

Finally, Stalcup requests that the Court conduct in camera
review of the classified portions of the command history of one
of the individual commands included in the search.  Pl.'s Mem.
19.  He claims that in camera review is appropriate given the
lack of detail in the Farris affidavit and what he considers

evidence of bad faith, see id. (citing Quinon v. FBI, 86 F.3d 1222, 1227-28 (D.C. Cir. 1996)) – but the Court has already ruled that the affidavit is adequately detailed and was filed in good faith, undercutting Stalcup's proffered basis for in camera review.  Moreover, the affidavit states that the responsive portions of this specific command history were already declassified in the wake of Stalcup's FOIA request, Farris Decl. ¶¶ 16-18, and given the presumption of good faith, the Court has no reason to doubt that the portions of the command history that remain classified are nonresponsive.  Accordingly, the Court declines to conduct in camera review of the command history.

## IV.  CONCLUSION

For the foregoing reasons, judgment shall enter for the Naval Special Warfare Command declaring that it has lawfully complied with Stalcup's requests pursuant to the Freedom of Information Act.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE